UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH ANNE P., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW SAUL, *Commissioner of Social Security* <br><br> Defendant. | Case No.: 20cv1029-MMA-MDD <br><br> **REPORT AND RECOMMENDATION GRANTING PLAINTIFF'S MERITS BRIEF** <br><br> [ECF No. 13] |

This Report and Recommendation is submitted to United States District Judge Michael M. Anello pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

Sarah Anne P. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final administrative decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"). (AR at 20-

34, 305-06).[1] For the reasons expressed herein, the Court **RECOMMENDS** Plaintiff's Merits Brief be **GRANTED** and the case be **REMANDED** for further proceedings.

## I. BACKGROUND

Plaintiff was born January 14, 1969. (AR at 305). At the time of Plaintiff's alleged disability onset date of September 13, 2014, Plaintiff was 45 years old which categorized her as a younger person. 20 C.F.R. § 404.1563. (AR at 33). Plaintiff was 50 years old, categorizing her as a person closely approaching advanced age, at the time of the ALJ's decision on May 10, 2019. (*Id.*).

### A. Procedural History

On August 12, 2015, Plaintiff protectively filed an application for a period of disability and disability insurance benefits under Title II of the Act, alleging a disability beginning on September 13, 2014. (AR at 305-06). After her application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ"). (AR at 20). Administrative hearings were held on August 8, 2018 and March 7, 2019. (AR at 41-137). Plaintiff appeared and was represented by an attorney. (*Id.*). Testimony was taken from Plaintiff and Connie Guillory, an impartial vocational expert ("VE"). (*Id.*). On May 10, 2019, the ALJ issued a decision denying Plaintiff's claim for a period of disability and disability insurance benefits. (AR at 20-34).

On June 17, 2019, Plaintiff sought review with the Appeals Council. (*See* AR at 15). On April 6, 2020, the Appeals Council denied Plaintiff's

---

[1] "AR" refers to the Certified Administrative Record filed on November 10, 2020. (ECF No. 11).

request for review and declared the ALJ's decision to be the final decision of the Commissioner in Plaintiff's case. (AR at 1). This timely civil action followed.

## II. DISCUSSION

### A. Legal Standard

Sections 405(g) and 1383(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error. *Id.*; *see also Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1993 (9th Cir. 2004).

Substantial evidence "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Courts look "to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id.* "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence, [the Supreme Court] has said, is 'more than a mere scintilla.' It means—and only means—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Ninth Circuit explains that substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012) (quotation marks and citations omitted), *superseded by regulation on other grounds*.

An ALJ's decision is reversed only if it "was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard." *Id.* "To determine whether substantial evidence supports

the ALJ's determination, [the Court] must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion." *Ahearn v. Saul,* No. 3:18-cv-05699-MLP, 2021 U.S. App. LEXIS 4472, at *5 (9th Cir. Feb. 17, 2021) (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The Court "may not reweigh the evidence or substitute [it's] judgment for that of the ALJ." *Id.* "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence can rationally be interpreted in more than one way, the court must uphold the [ALJ's] decision." *Mayes*, 276 F.3d at 459.

Section 405(g) permits a court to enter a judgment affirming, modifying or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Social Security Administration for further proceedings. *Id.*

### B.     Summary of the ALJ's Findings

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 13, 2014. (AR at 23).

At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, asthma, major depressive disorder, anxiety disorder, dissociative disorder, and post-traumatic stress disorder ("PTSD"). (*Id.*).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments. (AR at 24) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),

404.1525 and 404.1526)).

Next, after considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> The claimant can occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, or crawl. The claimant must avoid all exposure to dust, odors, fumes or other pulmonary irritants, and should not work at unprotected heights or around dangerous machinery. The claimant must be afforded leeway to shift position between standing and sitting (to alleviate discomfort), once or twice each morning and afternoon, while remaining on task. The claimant is limited to work involving simple and detailed, but not complex, tasks or decisions.

(AR at 25-26).

The ALJ said that his RFC assessment was based on all the evidence and the extent to which Plaintiff's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. (AR at 26). The ALJ also stated that he considered the opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527. (*Id.*).

The ALJ then proceeded to step four of the sequential evaluation process. He found Plaintiff was unable to perform her past relevant work. (AR at 32). For the purposes of his step five determination, the ALJ accepted the testimony of VE Connie Guillory. The ALJ determined that Plaintiff could perform jobs identified by the VE which exist in significant numbers in the national economy. For example, information clerk (DOT 237.367-022); referral/information aide (DOT 237.637-042); and teacher assistant (DOT 249.367-074). (AR at 34).

## C. Issues in Dispute

The issues in dispute in this case are: (1) whether the ALJ properly

rejected Dr. Middleton's opinion regarding physical functioning; and (2) whether the ALJ properly rejected Plaintiff's statements concerning pain, symptoms, and level of limitation. (ECF No. 13).

### 1. Dr. Middleton

Plaintiff argues the ALJ erred in according treating physician, Gregory David Middleton, M.D., "some weight." (ECF No. 13 at 5-10). Dr. Middleton opined that Plaintiff was disabled and could not work. (AR at 1235, 1252). Conversely, the ALJ gave significant weight to consultative examiner, Amy Kanner, M.D.'s opinion that Plaintiff "could perform light work with standing/walking for six hours and sitting for six hours in an eight-hour workday," "could occasionally bend, stoop, or crouch and never crawl or climb ropes, ladders or scaffolds," and "should avoid exposure to potentially irritating fumes." (AR at 30-31).

Dr. Middleton provided two letters in support of his opinion. On August 13, 2018, Dr. Middleton stated that Plaintiff has a "very severe case of fibromyalgia" and that her "severe pain has limited her ability to function and exercise." (AR at 1235). He opined that "her symptoms are certainly enough to qualify for disability." (*Id.*). Dr. Middleton declined to fill out an RFC form because he did "not have any objective medical testing or information to be able to decide how much weight a person can lift, or how long they can sit and stand." (*Id.*). He explained that if he did fill out such a form, he would merely be reiterating what Plaintiff told him. (*Id.*). Nonetheless, he concluded that Plaintiff would [not] be able to function at a normal job whether it be sitting or standing for an 8 hour workday." (*Id.*).

On February 6, 2019, Dr. Middleton wrote a letter to address Dr. Kanner's functional assessment of Plaintiff. (AR at 1252). He explained that Dr. Kanner's opinion was based, in part, on his first letter and not his

treatment records.  (*Id.*).  Dr. Middleton also took issue with Dr. Kanner's use of tender points to diagnose fibromyalgia and lack of documentation beyond the physical examination of Plaintiff to support her functional assessment. (*Id.*).   Dr. Middleton then explained that his opinion that Plaintiff is disabled "is based on years of experience treating fibromyalgia patients, as well as years of seeing [Plaintiff] . . . and really fully understanding the difficulties that she has faced, and the lack of response to multiple attempts at treatment."  (*Id.*).

In social security cases, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the plaintiff. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Where the treating doctor's opinion is contradicted by another doctor, as is the case here, it may be rejected for specific and legitimate reasons supported by substantial evidence in the record.  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The ALJ rejected Dr. Middleton's opinion because: (1) his opinion overstates Plaintiff's physical limitations and gives uncritical deference to Plaintiff's complaints; and (2) Dr. Middleton could not opine to specific functional limitations due to a lack of objective medical testing.  (AR at 31-32).   The Ninth Circuit recognizes that fibromyalgia's "symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia."  *Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001); *see also Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004); *Belanger v. Berryhill*, 685 F. App'x 596, 598 (2017).  "In the context of a disease that is diagnosed primarily through subjective self-reports, the fact that a treating physician relied on subjective complaints is not itself a valid basis to reject the physician's opinion."  *Belanger*, 685 F. App'x at 598-99.  However, rejection of a treating physician's opinion constitutes a specific and legitimate

reason when the opinion is premised on a plaintiff's own subjective complaints that the ALJ properly discredited. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989).

As discussed in detail below, the ALJ did not properly discredit Plaintiff's subjective complaints regarding fibromyalgia. Further, it was error to require objective medical testing because fibromyalgia is a disabling impairment that lacks objective tests to conclusively confirm the disease. *See e.g., Benecke,* 379 F.3d at 594 (holding that the ALJ erred by requiring objective evidence for a disease that eludes such measurement). As such, the ALJ did not provide specific and legitimate reasons for according less weight to Dr. Middleton's opinion than to Dr. Kanner's opinion.

**2. The Intensity, Persistence, and Limiting Effects of Plaintiff's Symptoms and Level of Limitation Finding**

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record" and do not support a more restrictive RFC. (AR at 26-27). The ALJ did not find that Plaintiff was malingering. (*See id.*). Where the ALJ does not find that the plaintiff was malingering, the ALJ must provide "specific, clear, and convincing reasons" for rejecting the plaintiff's testimony, while identifying the specific testimony the ALJ found "not to be credible" and explaining "what evidence undermine[d]" the testimony. *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1102 (9th Cir. 2014) (internal quotation marks and citations omitted).

**a. Statements Inconsistent with Medical Records**

In finding that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the record, the

8

ALJ specifically identified testimony regarding the severity of her symptoms and identified portions of the medical record that undermined her testimony. (S*ee* AR at 27-29). For the reasons discussed below, the Court concludes that the ALJ's decision to discredit Plaintiff's symptom testimony as inconsistent with the objective medical records is not supported by substantial evidence.

### 1. *Physical Impairments*

With respect to Plaintiff's fibromyalgia, the ALJ found inconsistencies between the record and Plaintiff's symptoms. For example, while Plaintiff reported extreme pain due to fibromyalgia, examinations revealed normal gait, normal extremity range of motion, and good range of motion of her spine, hips, knees, and shoulders. (AR at 28). Moreover, the consultative examiner noted that Plaintiff did not use an assistive device, had normal motor strength and intact sensation in the upper and lower extremities. (*Id.*).

Generally, inconsistency or contradiction with the medical record is adequate to reject a plaintiff's subjective testimony. *See Carmickle v. Comm'r SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008). However, the Ninth Circuit has recognized that "'there are no laboratory tests to confirm the diagnosis [of fibromyalgia],'" and fibromyalgia "is diagnosed 'entirely on the basis of the patients' reports of pain and other symptoms.'" *Revels v. Berryhill*, 874 F.3d 648, 656, 666 (9th Cir. 2017) (citations omitted). As such, "[i]n evaluating whether a [plaintiff's RFC] renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods . . . . The failure to do so is error." *Id.* at 662. The absence of objective clinical findings is not evidence of an inconsistency with Plaintiff's subjective complaints regarding fibromyalgia. *See Benecke v. Barnhart*, 379 F.3d at 594 ("The ALJ erred by 'effectively

1 require[ing] "objective" evidence for a disease that eludes such
2 measurement.'"). As such, the cited medical records—which lack affirmative
3 evidence of fibromyalgia—do not evince inconsistencies and do not provide a
4 clear and convincing reason for discounting Plaintiff's testimony.

5 The ALJ also found that treatment for Plaintiff's fibromyalgia is routine
6 and conservative. (AR at 28). He noted that Plaintiff found some relief for
7 fibromyalgia pain and fatigue throughout her treatment with the use of
8 Lyrica, ibuprofen, Marijuana, Tramadol, and vitamins. (*Id.*). "Any evaluation
9 of the aggressiveness of a treatment regime must take into account the
10 condition being treated." *Revels*, 874 F.3d at 667. "Fibromyalgia's cause is
11 unknown, there is no cure, and it is poorly-understood within much of the
12 medical community." *Benecke*, 379 F.3d at 590. Fibromyalgia does not lend
13 itself to aggressive treatment and faulting a plaintiff for not obtaining
14 aggressive treatment is illogical. S*ee Revels*, 874 F.3d at 667; *Benecke*, 379
15 F.3d at 590. Further, the medical record illustrates that medication did not
16 consistently treat Plaintiff's pain effectively. For example, Plaintiff
17 frequently adjusted her dosage of Lyrica and sometimes discontinued Lyrica
18 altogether based on it's efficacy. (S*ee* AR at 850, 897, 941, 965-67, 1018-20,
19 1088-92, 1115, 1196).

20 *2. Mental Impairments*

21 Regarding Plaintiff's mental impairments, the ALJ found "the
22 longitudinal treatment records" are inconsistent with her allegations because
23 her symptoms were "responsive to treatment." (AR at 28-29). Plaintiff
24 reported feeling depressed due to her fibromyalgia and that she was
25 diagnosed with PTSD due to a history of rape with intrusive memories of the
26 incidents. (AR at 28). Plaintiff "endorsed insomnia, increased appetite,
27 decreased energy, trouble concentrating, and decreased interest in normal

10

activities." (AR at 28-29). Plaintiff also reported "feeling suicidal in the past." (AR at 29).

The ALJ noted that Plaintiff reported feeling better, and increased energy, motivation, and activity with treatment. (AR at 29). Specifically, she reported improved concentration, decreased anxiety symptoms, sleeping better with medication, and improved mood with therapy. (*Id.*). Although Plaintiff is diagnosed with dissociative disorder with symptoms of multiple voices in her head, Plaintiff reported less interaction with those personalities with treatment and remains able to focus. (*Id.*). The ALJ noted that Plaintiff's "functional status remains intact, with appropriate affect, oriented and alert cognitive functioning, and interactive interpersonal skills." (*Id.*). The ALJ also noted that Plaintiff's other examining and treating providers indicated that Plaintiff was able to function within normal limits. (*Id.*).

When an ALJ considers a claimant's mental health issues, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." G*arrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). Although "[c]ycles of improvement and debilitating symptoms are a common occurrence . . . it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id.*

After careful consideration of the objective medical records regarding Plaintiff's mental impairments, the Court finds that the ALJ's decision to discredit Plaintiff's symptom testimony because she is responsive to treatment is not supported by substantial evidence. Plaintiff's symptoms fluctuate between euthymic and depressed moods, which affected her sleep, concentration, and other symptoms. Further, while there were a few therapy sessions where Plaintiff interacted less with her multiple personalities, they

were present and interactive in majority of her therapy sessions with Vicki Grove, LMFT.

Plaintiff saw Michele Manker, LCSW from December 1, 2015 to January 20, 2017. (AR at 1255-1287). She noted that Plaintiff's impairments were moderate to severe and that her anxiety and depression were high, but her notes otherwise lack specificity and detail. (S*ee* AR at 1260-127). Plaintiff was then treated by Feeby Wooden, PhD, from January 26, 2015 to June 30, 2015. (AR at 463-518).

On January 26, 2015, Feeby Wooden, PhD, conducted a psychological assessment on Plaintiff. (AR at 463-64). Plaintiff reported depression, anxiety, low energy, decreased motivation, withdrawal, change in sleeping patterns, poor concentration, and low self-esteem. (AR at 463). Dr. Wooden found Plaintiff to be alert with good hygiene and appropriate body movements, but also that she had "slumped posture, sad facial expression," was "submissive, teary, sad, [and] anxious." (*Id.*).

In early February of 2015, Plaintiff reported feeling "motivated" and explained that she got "herself to get out of 'sweat pants' for 3 days this week.'" (AR at 473). By mid-February, Plaintiff reported a regression from being triggered and thinking about her past sexual trauma. (AR at 474). In late-February, Plaintiff reported "increased anxiety [and] over thinking about if she can ever get a job with her fibromyalgia." (AR at 475).

Plaintiff's anxiety increased in March of 2015. Plaintiff complained of anxiety over finances and worrying about "how she is going to take care of herself after being denied social security." (AR at 476). She also reported decreased ability to sleep, which led to "ruminating over the past." (AR at 477). When Plaintiff was able to sleep again, she slept for 20 hours. (*Id.*). In mid-March Plaintiff appeared frustrated, angry, and resigned due to her

disability and financial needs.  (AR at 478).   The following week, Plaintiff was withdrawn and "cried hysterically during" the session.  (AR at 479).  She complained of increased depression and flashbacks from sexual trauma.  (*Id.*).

In April of 2015, Plaintiff "seemed better" and reported "increased energy and relaxation."  (AR at 480, 484).  She reported "feeling goo[d] and empowered" and was "open and more positive."  (*Id.*).  Plaintiff also indicated that "increased physical activities" decreased her depression.  (AR at 484).

Plaintiff's mood continued to be positive through May 2015.  (AR at 485-87).  In early June of 2015, Plaintiff reportedly was searching for a job as a minister and taking a palliative care class.  (AR at 488).  But, on June 17, 2015, Plaintiff reported having a "hard week" and feeling "more lonely and scared."  (AR at 489).  She explained that she was "ruminating and stressing over financials."  (*Id.*).   The following week, Plaintiff explained that she was "emotional" and was "grieving and missing her father."  (AR at 490).

On July 8, 2015, Plaintiff reported "feeling better" and that a recent visit with her family "helped stabilize her mood and that she was feeling increased connection and less shame."  (AR at 491).  On July 15, 2015, Plaintiff's mood was euthymic and her functional status was intact.  (AR at 492).  But, on July 22, 2015, Plaintiff's mood was depressed, and she reported lack of motivation and frustration.  (AR at 494).

In early August of 2015, Plaintiff was anxious and frustrated.  (AR at 496).  The following week, Plaintiff was feeling "more hopeful."  (AR at 498).  By the end of August 2015, Plaintiff was feeling "empowered," but struggled with less intrusive flashbacks during the night.  (AR at 499).

Plaintiff reported feeling better on September 2, 2015.  (AR at 500).  Her mood was euthymic and she had decreased depression, anxiety, lack of motivation, frustration, isolation, feelings of hopelessness/worthlessness, and

loss of interest. (*Id.*). But, by mid-September Plaintiff's mood was again depressed and she had increased depression, anxiety, lack of motivation, frustration, and loss of interest. (AR at 502). The following week, Plaintiff was again euthymic. (AR at 504).

On November 3, 2015, Plaintiff felt "more depressed" and Dr. Wooden added Methylfolic acid vitamin to help her antidepressants work better. (AR at 508). On November 24, 2015, Plaintiff was "feeling better" and "going out to the movies. (AR at 509). On December 1, 2015, however, Plaintiff was "[f]eeling heavy hearted" and reported "wanting to cry but feeling unable to." (AR at 510). Dr. Wooden noted that Plaintiff "cried quite a bit during [the] session." (*Id.*). By her next appointment on December 15, 2015, Plaintiff was feeling "empowered and positive." (AR at 511).

Plaintiff Saw Vicki Grove, LMFT from May 9, 2017 to February 5, 2019. (AR at 691-756, 1288-1324). On May 9, 2017, Plaintiff presented with "stress of not working, being on disability, living with [mother], losing friendships, weight loss, and wanting a sex life." (AR at 756). Plaintiff's mood was euthymic and her mental status examination was normal. (*Id.*). Plaintiff again presented with a euthymic mood on May 23, 2017. (AR at 754). But, on May 30, 2017, Plaintiff was depressed and reported widespread pain, a "terrifying" brain fog, and difficulty at social outings. (AR at 751). Plaintiff felt broken and cried. (*Id.*).

On June 13, 2017, Plaintiff was excited about an upcoming trip to San Francisco, but asked her therapist to help her with "waiting, living in the moment, and not panicking over things she can't control." (AR at 749). The following week, Plaintiff was depressed and tearful. (AR at 747). On July 25, 2017, Plaintiff was again "[e]uthymic" as she discussed her trip to San Francisco. (AR at 745). She reported "emotion eating when anxious" and

expressed an interest in learning how to avoid that. (*Id.*). The next six therapy sessions show a fluctuation in Plaintiff's mood. One week she was anxious, the next euthymic, and the third she was anxious and depressed. (AR at 739-43). Plaintiff reported being an "emotional wreck" during the third week with increased anxiety. (AR at 739). On September 5, 2017—the fourth week—Plaintiff was still anxious and reported flashbacks over the past week. (AR at 737). The next week, she was euthymic. (AR at 735). However, Plaintiff reported a "big cry" the prior Sunday and stated that she "[h]asn't showered since last Monday night—not sure why." (*Id.*). On September 19, 2017, Plaintiff was dysphoric. (AR at 733).

Plaintiff's mood continued to fluctuate. On September 26, 2017, Plaintiff was depressed and grieved "over [the] loss of everything." (AR at 731). On October 10, 2017, Plaintiff was depressed and anxious. (AR at 729). She reported flashbacks and poor sleep. (*Id.*). Plaintiff remained depressed and anxious until December 19, 2017, reporting increased anxiety and a "reprocessing" of a previous rape. (AR at 718-27). She discussed her financial stressors and "[g]rief over never having children." (AR at 718, 721, 725).

On January 9, 2018 and January 18, 2018, Plaintiff was euthymic and reported an "improved mood and energy." (AR at 714-16). Plaintiff returned to an anxious mood on January 25, 2018. (AR at 712). She remained anxious on February 1, 2018. (AR at 710). On February 8, 2018, Plaintiff was depressed, anxious, and tired. (AR at 707). She "sobbed throughout" her therapy session. (*Id.*). By the following week, Plaintiff's mood fluctuated again and she was euthymic. (AR at 705). Plaintiff was anxious by her next session and complained of "[s]queezing anxiety in [her] throat." (AR at 703). Plaintiff remained anxious and depressed over the next two therapy sessions,

returning to a euthymic mood on March 20, 2018. (AR at 697, 699, 701). On March 29, 2018, Plaintiff was still euthymic and stated that she had no "PTSD symptoms over [the] past week." (AR at 695). However, on April 3, 2018, Plaintiff's anxiety had returned. (AR at 693).

Plaintiff's mood continued to fluctuate between depressed and anxious and euthymic throughout the rest of 2018 and January of 2019, when Plaintiff last saw Vicki Grove, LMFT. (AR at 1288-1324). Plaintiff's mood was more often depressed and anxious throughout this time.

During these therapy sessions, reference is made to Plaintiff's multiple personalities. For example, in March of 2018, Plaintiff thought "Little Sara may be using candy as a way to cope with the fear of going to sleep." (AR at 697); (*see also* AR at 699) ("Little Sara came forward and stated she was afraid to sleep because when she sleeps he comes to get her."). On April 3, 2018, Plaintiff "checked in with Little Sara about anxiety" and "Middle Sara" was "angry and wanted to be left alone." (AR at 693).

On August 21, 2018, Plaintiff explained that the "[g]irls are tired and quiet," but they returned the following week and remained constant until late November of 2018. (AR at 1290-1309). For example, on October 2, 2018, Plaintiff "explored thoughts and feeling regarding Kavanaugh case and how it is triggering all the girls." (AR at 1300). Later in October, "Midler" agreed to address a belief that she has done really bad things and "Little and Anne agreed to support her." (AR at 1304). On November 27, 2018, Plaintiff was "unable to access Little or Middler." (AR at 1310). "The girls" returned at her next session on December 4, 2018. (AR at 1312). In January of 2019, Plaintiff talked about how the girls share her concerns over her dog and also shared in her joy during a trip to Palm Springs. (AR at 1319). Although Plaintiff sometimes reported less interaction with the personalities, she

regularly interacted with them.

Plaintiff's functional status was listed as intact during her therapy sessions, but the progress notes themselves show that Plaintiff's mood waxed and waned and that she consistently interacted with her multiple personalities, even with treatment. As such, the ALJ's decision to discredit Plaintiff's symptom testimony because she was "responsive to treatment" is not supported by substantial evidence.

**b. Daily Activities**

The ALJ recognized that Plaintiff does have severe impairments, but found that "they do not appear to significantly limit her daily functional abilities." (AR at 29). He noted that Plaintiff does laundry, "operates her own motor vehicle for transportation," maintains her own hygiene, handles finances apropriately, goes out to socialize, takes trips to visit friends or go on vacation, walks regularly, and has even applied for work in the past. (AR at 29-30).

There are "two grounds for using daily activities to form the basis of an adverse credibility determination:" (1) where the plaintiff's testimony contradicts her activities of daily living; and (2) where the activities of daily living meet "the threshold for transferable work skills." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The ALJ "must make specific findings relating to [the daily] activities and their transferability [to work skills] to conclude that a claimant's daily activities warrant an adverse credibility determination." *Orn*, 495 F.3d at 639 (internal quotation marks and citation omitted).

The Ninth Circuit has cautioned that a plaintiff need not be "utterly incapacitated" to be disabled. *Fair*, 885 F.2d at 603. "[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping,

driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Some activities, such as walking, are "not necessarily transferable to the work setting with regard to the impact of pain" because a plaintiff "may do these activities *despite* pain for therapeutic reasons." *Id.* "[T]hat does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved." *Id.*

The ALJ did not make any precise finding that any of Plaintiff's specific activities were not commensurate with her symptom testimony and did not make any finding that her activities of daily living were transferable to a work setting. In any event, many of the activities Plaintiff reported—socializing, shopping, caring for herself, and walking for treatment—do not "meet the threshold for transferable work skills," and are not probative of Plaintiff's disability status. S*ee Orn*, 495 F.3d at 639. Therefore, the ALJ was required to demonstrate that Plaintiff's activities contradicted her other testimony to rely on her daily activities as a basis to not fully credit her testimony.

Plaintiff testified "that she has difficulty reading" yet, reported to her therapist in August of 2018 that she was reading the Little House on the Prairie series and belongs to a book club. (AR at 29-30). Beyond that, the ALJ does not specifically identify statements contradictory to Plaintiff's activities of daily living. (*Id.*). The Court finds that having "difficulty reading" and reading or participating in a book club are not mutually exclusive. Plaintiff can participate in a book club and read books despite having a difficult time focusing on them. This inconsistency between Plaintiff's testimony and the objective medical records is not a clear and

convincing reason to reject her testimony.

Accordingly, the ALJ's reliance on Plaintiff's activities of daily living are not clear and convincing reasons to discount her symptom statements.

### c. Remand for Further Proceedings

The law is well established that the decision whether to remand for further proceedings or simply to award benefits is within the discretion of the Court. S*ee, e.g., Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McCallister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision. *See, e.g., Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984); *Lewin*, 654 F.2d at 635. When error exists in an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or exploration." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (citations and quotation marks omitted); *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). Accordingly, the Court recommends the case be remanded for further administrative action consistent with the findings presented herein.

### III. CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court **GRANT** Plaintiff's Merits Brief and **REMAND** this case for further proceedings consistent with the findings presented herein. This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

**IT IS HEREBY ORDERED** that any written objection to this report

must be filed with the court and served on all parties no later than **March 25, 2021.** The document should be captioned "Objections to Report and Recommendations."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 1, 2021**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:   March 10, 2021

Hon. Mitchell D. Dembin
United States Magistrate Judge